**HEIMERL LAW FIRM**
Wolfgang Heimerl, Esq. (NJ Attorney ID Number 46051996)
Robert J. Kinney, Esq. (NJ Attorney ID Number 038572005)
32 Dumont Road
Post Office Box 964
Far Hills, New Jersey  07931
Robert@HeimerlLawFirm.com
Wolfgang@HeimerlLawFirm.com
Tel: (908) 470-0200
Fax: (908) 470-0201
*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **BRADLEY B. HEISMAN and JULIA MATONTI,**<br><br>Plaintiffs,<br><br>vs.<br><br>**WYNDHAM VACATION RESORTS, INC.,**<br><br>Defendant. | Civil Action No. 20-11480-KM-JBC<br><br>Hon. Kevin McNulty<br><br>**FIRST AMENDED COMPLAINT** |

Plaintiffs, Bradley B. Heisman and Julia Matonti ("Plaintiffs"), individuals residing at 26 Lake Shore Drive, Montville, New Jersey, by way of Amended Complaint against Defendant, Wyndham Vacation Resorts Inc. maintaining offices at 6277 Sea Harbor Drive, Orlando, Florida state as follows:

**JURISDICTION AND VENUE**

1.	Jurisdiction and Venue are properly before this Court pursuant to 28 U.S.C. § 1332 (diversity of citizenship), wherein the Plaintiffs reside in the State of New Jersey and the Defendant is a Delaware corporation with principal offices in the State of Florida.

**THE PARTIES**

2.	Plaintiff Bradley B. Heisman resides at 26 Lake Shore Drive, Montville, Morris County, New Jersey.

1

3.      Plaintiff Julia Matonti resides at 26 Lake Shore Drive, Montville, Morris County, New Jersey.

4.      Defendant Wyndham Vacation Resorts Inc. ("Wyndham") is a Delaware corporation with its principal offices located 6277 Sea Harbor Drive, Orlando, Florida.

5.      Upon information and belief, on March 6, 2003, Wyndham registered with the New Jersey Secretary of State as a foreign corporation under entity number 0100899444 and appointed Corporate Creations Network Inc., 12 Christopher Way #200, Eatontown, New Jersey 07724 as its registered agent.

## NATURE OF ACTION

6.      This action arises out of Wyndham's policy and practice of misleading and deceptive timeshare sales presentations and its violation of the Florida Deceptive and Unfair Trade Practices Act.

7.      Wyndham's timeshare sales policies and practices are consistently deceptive and misleading. Wyndham makes similar misrepresentations to consumers about fundamental aspects of its timeshare program including the value of timeshare points, the availability of properties to book for vacation, the maintenance fees involved, the transferability of points, the advance booking time required for reservations, the booking fees, the expiration date of points, and the cost of travel through Wyndham versus using independent websites.

8.      Wyndham's business model is premised on the false assumption that it can intentionally mislead consumers to get them to sign confusing, vague and ambiguous boilerplate contracts and that because there is a purported written agreement, which so favors Wyndham that is it unconscionable, the consumer has no recourse.

9.      Wyndham has been heavily sanctioned for its deceptive practices through state government penalties, orders requiring rescission of purchase contracts and a $20 million verdict in a whistle blower case.

10.     Over the last two decades adverse awards against Wyndham, as well as settlements forcing it to pay damages, penalties and grant rescission, continue.

11.     In October 2003, the California Attorney General and the District Attorney for the County of San Mateo sued Trendwest Resorts, the predecessor of Wyndham, for its unlawful sales practices and material misrepresentations. The case was settled with Trendwest agreeing to an injunction barring it from further violations and requiring it to offer rescission to customers. It also was required to pay $795,000 in civil penalties. The estimated total value of the settlement was $4.3 million. The California Attorney General issued a Press Release about the settlement saying "Trendwest [predecessor to Wyndham] misled consumers through deceptive sales practices and non-disclosure, and illegally denied consumers the ability to cancel their contracts." October 29, 2003.   (https://oag.ca.gov/news/press-releases/attorney-general-lockyer-settles-lawsuit- against-one-worlds-largest-timeshare).

12.     In 2007, California customers sued Wyndham in a class action. (Wixon et. al. v. Wyndham Resort Development Corp., N. D. Cal. Case No. C 07-02361.)  The case settled on a class basis. The settlement class consisted of California residents, and persons who entered into transactions in California, who bought Worldmark timeshare interests from Wyndham. The settlement was for persons who purchased timeshares before November 5, 2006. Wyndham agreed to: (i) cancel 22 million vacation credits; (ii) make changes to its timeshare program; and (iii) to pay class counsel up to $5 million in legal fees.

13.     In 2015, the State of Wisconsin sued Wyndham for rescission of timeshare purchase contracts with 29 owners. As part of a settlement, Wyndham agreed to pay $665,000 in restitution, a $99,520 civil fine, $62,702.20 in fees and costs, and to rescind the contracts. (Sauk County Wisconsin Case No. 2015CX000005). The Wisconsin Department of Agriculture, Trade and Consumer Protection alleged that Wyndham sales personnel had made misrepresentations inconsistent with purchase contracts, telling customers gift incentives were available for one day only, and not disclosing on first contact with prospects that a timeshare sale was being offered. The restitution and debt relief was as high as $84,698 for one Madison, Wisconsin couple. After the settlement, Wyndham issued a press release promising to "meet the highest standards of fairness and transparency to consumers".
(https://www.wiscnews.com/news/local/crime_and_courts/wyndham-settles-consumer-complaints-for/article_c041b926-efda-53da-8d61-5560c7fc3718.html).

14.     In 2016, a Wyndham whistle blower employee was awarded $20 million (Williams v. Wyndham Vacation, Ownership, Inc., San Francisco Superior Court, Case No. CGC- 12-526187) after being wrongfully terminated. The whistle blower exposed that Wyndham defrauded elderly customers, opened maxed out credit cards without their knowledge, and lied about fees. In its rulings on post-trial motions, the court found that "Wyndham's San Francisco site was defrauding many customers, mainly the elderly... When timeshare sales were off, Wyndham had 'TAFT Days' "Tell Them Any Frigging Thing'". (See Williams, *supra,* Slip Op. at pp. 1-2, dated March 10, 2017).

15.     After consumers are convinced to sign lengthy form contracts, through deceptive sales practices, that even a lawyer would have a tough time to fully comprehend, Wyndham then breaches its form contracts entitled " Security Agreement - ClubWyndham Access Vacation Ownership Plan - Retail Installment Contract - Purchase and Security Agreement" (the "Security Agreement") by not making destination accommodations available, by charging excessive fees not referenced in the contract, and by failing to provide promised ancillary Securitys. Wyndham, encourages consumers, largely the elderly, to open revolving credit card accounts to pay large deposits for Wyndham products extolling the benefits of earning rewards points to be used for further vacation travel and expenses.

16.     Rather than reforming its practices, Wyndham has seemingly calculated the business risks and continued on its prior path and acknowledges the current litigation risk could be nearly $60 million.  In Wyndham's Annual Report for the year ended December 31, 2019 as filed with the Securities and Exchange Commission, it disclosed the following regarding its litigation risks:

3

The Company may be from time to time involved in claims, legal and regulatory proceedings, and governmental inquiries arising in the ordinary course of its business including but not limited to: for its vacation ownership business — breach of contract, bad faith, conflict of interest, fraud, consumer protection and other statutory claims by property owners' associations, owners and prospective owners in connection with the sale or use of VOIs or land, ... claims relating to vacation ownership units or resorts or in relation to guest reservations and bookings; and negligence, breach of contract, fraud, consumer protection and other statutory claims ... related to vacation ownership units or resorts or in relation to guest reservations and bookings; for its vacation exchange business — breach of contract, fraud and bad faith claims by affiliates and customers in connection with their respective agreements, negligence, breach of contract, fraud, consumer protection and other statutory claims asserted by members, guests and other consumers for alleged injuries sustained at or acts or occurrences related to affiliated resorts….

The Company records an accrual for legal contingencies when it determines, after consultation with outside counsel, that it is probable that a liability has been incurred and the amount of the loss can be reasonably estimated. In making such determinations, the Company evaluates, among other things, the degree of probability of an unfavorable outcome and, when it is probable that a liability has been incurred, the Company's ability to make a reasonable estimate of loss. The Company reviews these accruals each fiscal quarter and makes revisions based on changes in facts and circumstances including changes to its strategy in dealing with these matters. The Company believes that it has adequately accrued for such matters with reserves of $13 million ... as of December 31, 2019 .... although the Company believes that its accruals are adequate and/or that it has valid defenses in these matters, unfavorable results could occur. As such, an adverse outcome from such proceedings for which claims are awarded in excess of the amounts accrued, if any, could be material to the Company with respect to earnings and/or cash flows in any given reporting period. As of December 31, 2019, the potential exposure resulting from adverse outcomes of such legal proceedings could, in the aggregate, range up to $48 million in excess of recorded accruals.

### ARBITRATION AND FILING PREREQUISITES

17.    In an attempt to keep consumer disputes out of the public eye, the Security Agreement requires all disputes to proceed to arbitration with the American Arbitration Association under the Consumer Arbitration Rules (see, Article 34 of the Security Agreement, Exhibit A).

18.    Prior to filing a Demand for Arbitration, the parties are required to provide thirty (30) days' notice and negotiate in "good faith". By letter dated April 7, 2020, Plaintiffs, through counsel, provided the requisite thirty (30) day notice (Exhibit B). Rather than participate in any good faith negotiations, on May 4, 2020 (nearly 60 days following the thirty (30) day notice letter), Wyndham continues to assert its practices are wholly appropriate and will make no accommodations (Exhibit C).

19.     On June 26, 2020, Plaintiffs filed a Statement of Claim with the American Arbitration Association ("AAA") as required by the Security Agreement. (see, Exhibit D for a copy of the AAA filing receipt).

20.     On July 8, 2020 the AAA declined to administer the claim because "[p]rior to the filing of the arbitration, Wyndham Vacation Resorts, Inc. failed to comply with the AAA's policies regarding claims." and advised that [a]cording to R-1(d) of the Consumer Rules, should the AAA decline to administer an arbitration, either party may choose to submit its dispute to the appropriate court for resolution." (see, Exhibit E).

21.     On September 2, 2020, despite knowing that the arbitration clause was invalid, Defendants attempted to force Plaintiffs to arbitrate, but were rebuffed by this Court, which held that Defendants actions prejudiced the Plaintiffs and entitled them to costs.  (see, Docket Nos. 8, 9 for this matter).

## WYNDHAM AS A COMPANY

22.     Wyndham is the largest timeshare ownership program in the world with 880,000 property owners and over $4 billion in net revenues in 2019. It develops and operates a portfolio of over 230 resorts throughout the world with 25,000 individual units.

23.     Wyndham markets and sells vacation ownership interests in the form of points, provides consumer financing in connection with the sale of points, provides property management Securitys to the purchasers, and develops and acquires vacation ownership resorts.

24.     On August 2, 2017, Wyndham Worldwide issued a press release that it would separate into two publicly traded companies. It announced that Wyndham Vacation Ownership would be the world's largest publicly traded timeshare company. Wyndham Vacation Ownership joined with RCI. RCI was the world's first and largest vacation exchange network with over 4,300 affiliated properties in more than 100 countries. The joinder of Wyndham Vacation Ownership and RCI was to provide purchasers of Wyndham points with the widest possible availability of timeshare units for vacation usage. In the press release announcing the change, Michael Brown, CEO of Wyndham Vacation Ownership, stated: "By joining the largest timeshare company in the world with the largest timeshare exchange network and connecting them seamlessly to the Wyndham Rewards platform, we will be positioned to provide the widest variety of vacation opportunities to our owner base and network affiliates. (Wyndham Worldwide Announces Plan to Become Two Publicly Traded Hospitality Companies, Wyndham Destinations Press Releases (August 2, 2017). (https://www.wyndhamdestinations.com/us/en/news-media/press-releases/wyndham-worldwide-announces-plan-become-two-publicly-traded-hospitality).

25.     On its website, Wyndham Destinations Inc. boasts that it has over 4,300+ vacation destinations and that as the world's largest vacation ownership, exchange and rental company, it makes every trip a perfect vacation experience.  (https://www.wyndhamdestinations.com).

## WYNDHAM'S BUSINESS MODEL

26.     In the traditional timeshare business model, a participant purchases a fractional interest in a specific piece of property and receives a deed, duly recorded with the county Register, which can be sold or willed to an owner's heirs. The member would own the right to a specific week of occupancy in a particular unit in a specific identified property. The participant could then be entitled to trade that week of ownership for a week in another property. However, if the member did not trade his or her week, he or she was guaranteed the right to stay, on the identified week, in the identified property. In this traditional model there are a limited amount of fractional shares that can be sold as there is a specific number of resort units and only so many weeks in a year.

27.     In the Wyndham model, participants purchase points which are supposed to be currency to stay at any Wyndham or affiliated resort throughout the world. Fundamental to the Wyndham sales and marketing pitch is that purchasers will have a vast array of choices and will be able to stay at their desired property wherever it might be at desired times. Purchasers buy points so they can travel to their desired location where ever it may be. Under the Wyndham model, there is seemingly an infinite number of points that are available for sale.

28.     Upon information and belief, nearly 40% of the desired destinations are not regularly available at any time, requiring participants to book sometimes as much as a year in advance, assuming they are available at all.  Even then, certain properties will be unavailable to participants.  Participants are not told this is the case and the sales pitch is therefore false and misleading.

29.     The business practice of Wyndham is to focus on selling points, rather than managing the destinations and making them available to members. Wyndham members find that there is little availability. When they complain, Wyndham's response is that they need to buy more points to elevate their status level.

30.     Wyndham members are subject to a hard sell marketing pitch to buy more points and upgrade their membership. When a member arrives for a vacation at a destination, the sales pitch starts before they have even checked in.  A common Wyndham ploy is not to give a parking pass to a member until they agree to attend an "owner update meeting". The purported owner update meeting is nothing more than another high-pressure sales presentation to get them to buy more points.

31.     If Wyndham members elect not to attend a sales meeting upon check in, they are constantly barraged with phone calls and messages to their rooms to attend more sales meetings. These meetings typically last for several hours extolling the benefits of acquiring additional points.

## THE MISLEADING AND DECEPTIVE WYNDHAM SALES PRESENTATIONS

32.     The Wyndham sales presentations follow the same pattern. The key elements are: (i) prospects are not told up front that they will be attending a lengthy high pressure Wyndham timeshare sales meeting; (ii)  prospects staying at a Wyndham owned hotel or resort are enticed to attend the timeshare sales meeting by the offer of a free gift, free trip, discount coupon or prize;

(iii) purchasers are lied to about how long the meeting will last – the sale pitch is that if you just attend this one hour or 90 minute meeting, you will "earn" the offered gift or prize; (iv) in reality, the sales presentations usually last five or six hours; (v) potential customers are physically worn down by the length of the meetings; (vi) the Wyndham strategy is to break down the prospective purchaser's resistance to buying by relentless physical and psychological pressure; (vii) prospects are told that they need to buy for the sake of their children, to be able to leave the points to their children, to spend time with their families and to fulfill their dreams of being able to vacation anywhere in the world; (viii) people are kept in the meetings for hours at length by free food, the offered gifts and a never ending barrage of "special" bonus points if they sign a contract right away; (ix) whenever someone shows resistance, the sales person leaves to consult with a manager and then comes back to offer special bonus points, some type of additional prize or gift, and the offer of a higher level of membership; (x) the sales pressure is relentless throughout the day; (xi) Wyndham makes it difficult for people to leave by the threat of losing their prizes, and other tactics such as checking in purses and transporting attendees in vans to off site locations so they have no simple way to return; (xii) one-on-one sales pitches are made throughout the day and a prospective purchaser is often assigned one person who stays with them the entire time to befriend them;  (xiii) a false sense of urgency is created with repeated use of phrases such as "one time offer" and "today only" to create the impression that prospects can never have the same opportunity again; and (xiv) prospective purchasers are told that if they would like a lawyer or financial advisor to review the documents, the great offers provided would be rescinded.

33.    Individuals are repeatedly lied to about the material elements of the program including misrepresentations that points will not expire, that desired units will be available, that maintenance fees will not increase, that long advance booking time is not required, and that points are easily transferable or marketable.

34.    First person narratives about what goes on at Wyndham sales presentations can be found in complaints filed with the State of Florida.  By way of example a written statement from Kathryn Bryan of Oregon, Ohio filed a complaint with the Florida Division of Consumer Affairs on September 5, 2018 wherein she stated as follows: "We met with Brett Sherman who described the benefits of owning Wyndham points, how Wyndham was continuously purchasing resort properties for its owners, and how reasonably priced Wyndham points were. We were about to leave when the sales manager came over and stated that if we purchased 154,000 points at that meeting, he would allocate an additional 154,000 bonus points which would put us in a Silver Owner level. We were told that by doing this it would allow us to stay at any of the Wyndham properties around the world. Later we found out this was totality [sic] not true, but the lie did come to light until we tried to a book a week stay in Hawaii for our anniversary."

35.    Ms. Bryant goes on to describe "owner update" meetings which were promised to last 90 minutes. Purchasers were enticed to attend with $50 gift cards. The meetings actually lasted 4 ½ hours. Her narrative continues with descriptions of subsequent sales meetings. She confronted a senior sales manager with misrepresentations from prior meetings. He responded: "Maybe so, but these people are no longer here. And whatever they told you we do not have to honor'. He in essence told us that we had been lied to but then said that he could help us get out of this situation if we purchased an additional 210,000 points. ... We were accompanied to the finance office by all three salespersons. It felt like we were under arrest or going to the firing squad. All we wanted to

do was straighten out the lies that we had been told that the other salespeople had told us and get the mess cleaned up. We deposited an additional $3,842.69 and financed the additional points for $34,807.01 ... The additional points and our Platinum status would guarantee us reservations at the Emerald Grade any time of the year even in the winter months. The sales manager did not tell us that Wyndham had only taken over a certain number of 2/3/4 bedroom units (no 1 bedroom units). We had to discover this on our own when we attempted to book a one week stayed [sic] there and called the Emerald Grande directly. We were informed they could not accommodate us in any unit for an indefinite period of time no matter what our level with Wyndham. (Yet more omission/ misrepresentation of facts) But you know it can't even be called that. It is just out-and-out lying." (see, Exhibit F).

36.     Ms. Byant highlights the misleading and deceptive Wyndham tactics. Its sales people routinely falsely tell purchasers that the solution to their availability problem is to spend more money for more points.

37.     Wyndham sales people are trained to make misrepresentations. The whistle blower complaint filed by former Wyndham sales people Patricia Williams and Steve Gutfield against Wyndham (Superior Ct. State of California, San Francisco County Case No. CGC 12-526187) lays this out in excruciating detail. Plaintiffs state in their First Amended Complaint : ... Ms. William overheard other sales associates making illegal and false representations to various customers. ... For example, some owners were informed if they increased their points (points are used to establish eligibility for various products), they could do so at essentially no cost. ... Other member Securitys representatives falsely represented that they were going to be reducing the monthly statements for owners or that maintenance fees would be 'capped', when in fact such payments were actually being deferred or they were subject to increases. These 'lower monthly payments' schemes in reality were simply a way to fraudulently induce customers into buying more Securitys and borrowing more money. (Williams First Amended Complaint ¶17.)

38.     The Williams Plaintiffs go on to allege that Wyndham knew of, sanctioned and encouraged the fraudulent behavior in order to drive up sales. Numerous supervisors and managers were aware of the conduct. Indeed, sales manager Steven Savino began "conducting training meetings in which he taught employees how [to] use unethical methods for selling timeshares..." (William First Amended Complaint ¶¶ 22 & 24).

## THE RICH GET RICHER

39.     While opining that Wyndham may be subject to over $60 million in litigation risk in 2020, Wyndham's filings with the Securities and Exchange Commission reveals that it issued more than 75 stock grants to officers and directors during the period January 1, 2020 to June 17, 2020 for nearly 1.5 million shares, which at the June 17th stock price of $30.92 equals approximately $45 million of stock grants in less that six (6) months.

40.     Wyndham's public filings also reveal that over a two-day period (June 9, 2020 - June 10, 2020) Stephen Holmes, Wyndham's Chairman of the Board of Directors sold 100,000 of his shares for more than $3.5 million -- a weighted average of more than $35 per share, a 13% premium of the closing stock price one week later on June 17, 2020.

## PLAINTIFFS' WYNDHAM EXPERIANCE

41.     In May 2019, Plaintiffs (ages 61 and 78 respectfully) were on vacation at a Wyndham resort, in West Palm Beach, Florida. They had no prior dealings with Wyndham. Wyndham's sales staff befriended the Plaintiffs and offered them incentives to attend a timeshare sales presentation. The presentation lasted nearly an entire day.   Among other things, the following misrepresentations or omissions highlight Wyndham's unconscionable sales practices and tactics:

• Not being made aware of any notice requirements to utilize points and book vacations;
• Affirmatively being told Plaintiffs could book hotels/airfare anywhere in the world, this has not been the case;
• Affirmatively being told that they would be assigned their own individual travel specialist to help us plan our trips, this has not happened;
• Affirmatively being told that Plaintiffs would be contacted by a representative to help them set up an iPad to look at potential vacation sites, this has not occurred;
• It is impossible to reach anyone on the phone to plan a trip, when a live body is reached, the line gets disconnected;
• Buyers were detained for the promotional meeting for approximately eight hours, when it was represented to be a 90 presentation;
• The salesperson that was assigned to Plaintiffs was so nice and friendly and said she would help whenever assistance was needed, however despite repeated calls, she never responded. Finally in response to a text messages explaining buyers frustration and issues, she did nothing but respond with a frowning emoji;
• Failure to disclose escalating nature of maintenance fees;
• Plaintiffs were only recently told that there is  a large fee to carry over points from year-to-year;
• Plaintiffs were told that they could not have an attorney review the documents prior to execution, and that any offers would be retracted if Buyers sought attorney review;
• Plaintiffs were offered a 2-week vacation anywhere in the world for joining Wyndham, however despite repeated requests have been unable to receive any information on it or how to take advantage of such offer;
• Wyndham never disclosed that there is a fee if points are transferred/deposited with RCI;
• Affirmatively represented that points could be redeemed for cash, simply not true;
• Affirmatively represented that contract could be passed on to the Plaintiffs' heirs free and clear, similar to a traditional timeshare, not true;
• No disclosure of how many points equal a hotel stay or airfare;
• Affirmatively represented that points could be banked for years, and Plaintiffs recently learned points expire after one year unless a further fee is paid;
• Affirmatively represented it was significantly cheaper to book hotels and airfare through Wyndham, however, Plaintiffs actually found it less expensive to purchase airfare and hotels privately. Also, Buyers found availability after Wyndham stated there was no availability;
• Affirmatively represented that units were almost always available and that long advance booking was not required;

•    No mention was ever made regarding the number of points needed to book accommodations varied between high and low season;

•    Affirmatively represented that the Barclay's credit card required to be opened to pay for the deposit would be offered at 0% interest, not true.

42.    In order to entice the Plaintiffs to purchase Wyndham points, sales representatives offered a $43,200 "discount" off of the claimed "Gross Purchase Price" of $101,200 for a net price of $58,000.  In a further attempt to close the deal Wyndham offered 600,000 "Bonus" points.  Accordingly, the Agreement assigned to Plaintiffs 400,000 "perpetual points" for the sum of $58,000.00.

43.    Wyndham sales representatives then induced Plaintiffs to open credit card accounts through Defendant's affiliated partner, Barclays Bank, for the purpose of funding the $14,612.15 down-payment on the Wyndham Club timeshare.  A "Wyndham Rewards ® Visa Signature ®" credit card ### #### 7743 was opened in Plaintiff Bradley Heisman's name with an initial balance of $14,612.15.  Principal and interest on the mortgage amount of $43,761.75 were charged to a separate "Wyndham Rewards ® Visa Signature ®" credit card ### #### 7768 issued in Plaintiff Julia Matonti's name on a monthly basis.

44.    The finance charge for the mortgage was 13.49%, making the total cost to Plaintiffs $95,006.45 -- well in excess of the $58,000.00 face purchase price and nearly the claimed "Gross Purchase Price" of $101,200, effectively eliminating the discount.

45.    Even that inflated finance charge was illusory because the interest rate on Bradley Heisman's Wyhdam Rewards Credit Card was 17.49% for the down-payment, and the interest rate on Julia Matonti's card was 22.24% for the principal and interest charges and maintenance fees.

46.    The Security Agreement entered into by the Plaintiffs with Defendant, by its terms, provides that "each ownership constitutes a Florida time-estate under Chapter 721, Florida Statutes."  Chapter 721, Florida Statutes further defines a time share as "a parcel of real property under the laws of this state."  Fl. Stat., Chapter 721.05(34).

47.    By the terms of Chapter 721, Florida statutes Plaintiffs own a parcel of real property under Florida law, which by the terms of the contract is located at 6277 Sea Harbor Drive, Orlando, Florida 32821.  Defendant refuses to disclose to Plaintiffs the percentage interest in the real property at 6277 Sea Harbor Drive that Plaintiffs own.

48.    The Agreement entered into between Plaintiffs and Defendant involves a loan amount of $43,761.75 at 13.49% interest, and by the Agreement's terms is a mortgage subject to the Real Estate Settlement Procedures Act, 12 U.S.C. 2601 et seq.  Upon information and belief average fixed residential mortgage rates available to consumers in Florida in May 2019 were approximately  3.94%.   See   https://themortgagereports.com/61853/30-year-mortgage-rates-chart#perspective.

49.    The Security Agreement does not explain the "perpetual" nature of the points and how 400,000 points per year equate to the $58,000, heavily discounted purchase price.

50.     Accordingly, the Security Agreement fails for its ambiguity. Additionally, the Agreement is so one-sided in the favor of Wyndham is unconscionable and void as against public policy.  For these reasons the Security Agreement is void ab initio and should be rescinded.

51.     After purchasing the "perpetual points", Plaintiffs discovered that destinations were not available as represented and they stood a better chance at staying at that Wyndham resort by booking through third-party vendors at much less cost.

## COUNT ONE
## (BREACH OF CONTRACT)

52.     Plaintiffs repeat and reallege the allegations of paragraphs 1 to 51 above as if set forth herein at length and in detail.

53.     At all relevant times, a contract existed between Plaintiffs on the one hand, and Wyndham on the other hand.

54.     Pursuant to the Security Agreement, Wyndham agreed to reasonably provide Club Accommodations to Plaintiffs.

55.     Accommodations are not available and advance booking times are excessive.

56.     Wyndham has failed to reasonably provide club accommodations in breach of the Security Agreement.

57.     In further breach of the Security Agreement, Wyndham charged Plaintiffs undisclosed and excessive fees such as maintenance fees and booking fees.

58.     In still further breach of the Security Agreement, Wyndham attempted to force Plaintiffs into arbitration despite knowing that the Security Agreement arbitration clause was invalid under the requirements of the American Arbitration Association, thereby inducing costly motion practice.

59.     The Plaintiffs were damaged by Wyndham's breaches of the Security Agreement in an amount to be proven at trial.

## COUNT TWO
## (BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING)

60.     Plaintiffs repeat and reallege the allegations of paragraphs 1 to 59 above as if set forth herein at length and in detail.

61.     The Security Agreement has an implied covenant of good faith and fair dealing.

62.     Wyndham is required to refrain from unreasonable conduct which would prevent Plaintiffs from receiving the benefits of their bargain.

63. By reason of the conduct alleged above, Wyndham has breached this covenant by frustrating the overarching purpose of the Security Agreement.

64. The Plaintiffs were damaged by Wyndham's breaches of the covenant of good faith and fair dealing, including but not limited to suffering emotional distress, in amounts to be proven at trial.

## COUNT THREE
## (CLAIM FOR DECLARATORY RELIEF)

65. Plaintiffs repeat and reallege the allegations of paragraphs 1 to 64 above as if set forth herein at length and in detail.

66. Plaintiffs seek declaratory relief and rescission of the Security Agreement.

67. The Security Agreement is void *ab initio* for being vague and ambiguous as to the property right being sold and purchased and the unconscionable nature of the provisions of the Security Agreement.

68. The contract should be declared void *ab initio* for its failure to adequately contain all required material terms in sufficiently plain language for the Plaintiffs to understand the same.

## COUNT FOUR
## (VIOLATION OF FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT)

69. Plaintiffs repeat and reallege the allegations of paragraphs 1 to 68 above as if set forth herein at length and in detail.

70. Chapter 501 (Consumer Protection) of Title XXXIII (Regulation of Trade, Commerce, Investments, and Solicitations), specifically, Part II (Deceptive and Unfair Trade Practices) of the Florida Statutes (the "Act") outlaws unfair or deceptive trade practices, whether or not any consumer is in fact misled, deceived or damaged thereby. Unfair or deceptive trade practices include misrepresenting a material fact if such failure has a tendency to mislead; and failing to state a material fact if such failure has a tendency to mislead.

71. The Act sets forth what, among other things, constitutes a violation of the Act as follows: "501.204 Unlawful acts and practices. (1) Unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

72. The Act provides private remedies for private parties as follows: "501.211 Other individual remedies. (1) Without regard to any other remedy or relief to which a person is entitled, anyone aggrieved by a violation of this part may bring an action to obtain a declaratory judgment that an act or practice violates this part and to enjoin a person who has violated, is violating, or is otherwise likely to violate this part. (2) In any action brought by a person who has suffered a loss

12

as a result of a violation of this part, such person may recover actual damages, plus attorney's fees and court costs as provided in s. 501.2105."

73.    By reason of the conduct alleged above, Wyndham violated the Act.

74.    Plaintiffs are entitled to actual damages, attorneys fees and costs due to Wyndham's violation of the Act.

## COUNT SIX
## (FRAUD IN THE INDUCEMENT)

75.    Plaintiffs repeat and reallege the allegations of paragraphs 1 to 74 above as if set forth herein at length and in detail.

76.    Wyndham and its agents knew, or should have known, of the falsity of the misrepresentations and omissions when made and/or made them recklessly.

77.    Wyndham and its agents intended that Plaintiffs be induced to act based on such misrepresentations and omissions.

78.    Plaintiffs actually and justifiably relied on the misrepresentations and omissions, and thereby sustained injury.

79.    Wyndham's actions were willful, wanton and malicious so as to allow the recovery of punitive damages.

## COUNT SEVEN
## (VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT,
## N.J.S.A. 56:8-1 ET SEQ.)

80.    Plaintiffs repeat and reallege the allegations of paragraphs 1 to 79 above as if set forth herein at length and in detail.

81.    Plaintiffs have been subject to an unconscionable mortgage interest rate on their purchase, which at the time of purchase was more than four times greater than average conventional mortgage rates.

82.    Despite several attempts, Plaintiffs have been unable to book preferred vacation rentals using their applicable points at any of Defendant's properties.

83.    The New Jersey Consumer Fraud Act (NJCFA), N.J.S.A. 56:8-2 makes unlawful the "act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate . . . whether or not any has in fact been misled, deceived or damaged thereby."

84.     It is an unconscionable commercial practice and a material misrepresentation of the Agreement to include an arbitration clause in the agreement that Defendants knew was inoperative at the time the agreement was signed because of Defendant's failure to adhere to the requirements of the American Arbitration Association.

85.     It is an unconscionable commercial practice to charge a person an excessive mortgage financing rate when that person is eligible for a much lower rate.

86.     It is a deceptive practice to fail to inform a consumer that lower financing rates might be available to them for a mortgage purchase.

87.     The concealment of information about lower financing rates violates the NJCFA.

88.     It is unlawful under the NJCFA to deceive, use false pretense or a false promise with the intent that another rely upon such deception, false pretense, or false promise.

89.     Plaintiffs were misled and deceived into believing that they would have reasonable access to Club Wyndham properties, when in fact nearly 40% of Wyndham properties were effectively off-limits to them at any time and they were therefore unable to book vacations because of the unavailability of such properties.

90.     Plaintiffs were deceived by the Defendant's acts because they were induced into financing their down payment and mortgage through the use of credit cards with interest rates of 17.49% and 22.24%, respectively, when conventional mortgage financing was available and could have been offered to them at much lower fixed interest rates.

91.     The NJCFA provides that "in addition to any other appropriate legal or equitable relief, [the court shall] award threefold damages sustained by any person in interest.  In all actions under this section, including those brought by the Attorney General, the court shall also award reasonable attorneys' fees, filing fees and reasonable costs of suit."

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs pray for the following relief:

A.     For a declaration that the Security Agreement is void *ab initio*;
B.     For rescission of the Security Agreement;
C.     For restitution of all monies paid to Wyndham;
D.     For compensatory damages;
E.     For punitive damages;
F.     For treble damages and other relief as authorized by the NJCFA.
G.     For attorneys' fees; and,
I.     Such further and other relief as the Court deems just and proper.

Respectfully submitted,

/s/ Robert J. Kinney

Robert J. Kinney, Esq.
Attorney for Plaintiffs